Margaret Budde v. Global Power. Mr. Block. Good morning, Your Honors. If it pleases the panel, Jeffrey Block on behalf of the Plaintiff Appellants. As I'm sure Your Honors are aware, this is a lawsuit that alleges that Global Power and its former CEO and CFO issued materially false and misleading financial statements and that they were aware they were being issued at the time. The company admitted that its financial statements, the ones that were in question for 2013 and 2014, were false and misleading by restating those results. I think you don't dispute that if it's a very small financial amount, that that's not material. I think, Your Honor, it depends in the context in which it occurs. I think if — first of all, I think — But there is a world in which some amount, even though it's admittedly false, even though it's admittedly knowingly false, it's just too small to be material. I'm not saying that's the case. I'm just asking — Right. Okay. So — I do think that, yes, there's a materiality analysis that applies. As the Supreme Court has said, there's — you weigh the facts in the assessment of what — how that impacts. I think that's also overlaid with the finding that a court does on Scienter, where you are going to weigh the specific facts, and if you have a case where the amounts are so small that a court can find that is so small that it's just not material, or it is so small that I can't find that these defendants would actually know that they were issuing false financials, that, yes, that could be the case. Okay. Assuming that it's immaterial or not material, then what do you rely on for Scienter? Well, here — Specifically. One, two, three, four. I mean, just straight — give it to me straight. Here, Your Honor, we don't — first of all, we don't think that the amounts at issue that these two defendants threw about were immaterial. But assuming — I understand that. But assuming that it was immaterial, then where do you go then? Well, I still think if these amounts, if the court finds and says, look, these amounts are just immaterial, I still think the court can look at other facts in the complaint to say, are there enough facts alleged to support a strong inference of Scienter? And I think what we have here is not only do you have, as we say, these two individuals know that the ES segment is issuing financial statements that contain errors, but what you also have is you have the overlay of the issues with the internal controls. Remember, CW1 and CW4 are stating that both Gruber and Ramirez know that BDO is continuing to express concerns about the internal controls. And I understand the inference the district court drew, which was that the outside consultants were hired to address those concerns. But the outside consultants were in place essentially by January of 2014. BDO continues to express those concerns into October of 2014. Okay. But what I'm looking for is what evidence did you rely on or what theory maybe it is that you rely on to establish Scienter if the known facts of the misrepresentation of the immaterial amount is not to be considered? Where do you go from there to establish the fraud, that is, in the Scienter that they knew they were committing a fraud? Well, I think, Your Honor, that, one, I think you should consider even the facts about the immaterial amounts, and obviously we don't agree they're immaterial, because I think what you have to do is look at everything holistically. So when you look at if they know that there are bad numbers coming out of the ES segment in 2013 affecting 2014, they know that there are internal control problems that BDO keeps saying that you don't have the qualified people here. Those two facts together should say to these two individuals, not only is BDO telling us that our internal controls are inadequate, we don't have the right people to make sure the numbers are right, but we also know that some of those numbers are wrong. So when you put those two facts together, I think that gives you the circumstantial evidence to support an inference that they knew or recklessly disregarded. My problem is that on all of that, as I understood it, and I'm trying to get you to change my mind, is that it amounts to negligence or maybe even gross negligence, but where is the scienter that is required that they intentionally misrepresented the earnings of the company or the profits of the company or whatever? Well, I think, Your Honor, one, that, as I said, you have circumstantial evidence, which this Court has repeatedly said a plaintiff can rely on to support scienter where you have. I know some of my financials are wrong. I know that my auditors are telling me my internal control function isn't working properly. When you put those two together, it certainly raises the inference. You know there's a problem with your financials that are going out. If I can circle back to the materiality question, one of the things that we argued was that the district court limited the materiality analysis to the April 2014 conversation, a couple million dollars in revenue. But certainly by July of 2014, our CW7, who, by the way, was identified by the defendants in the briefing on the dismissal on the second complaint, and the court acknowledged that, and CW10 brought to the attention of the CEO and CFO, we have $20 million worth of revenue now. That's become a problem in 2014 because of the 2013 problems. So it was really more than just a couple million dollars worth of problems in revenue recognition. It was really 20. So where do you plead that the defendants knew or were reckless in not knowing about 20 million, as opposed to merely, as Judge Jolly said, sort of a negligence theory? Well, I think where we plead it, Your Honor, is in the July 2014 conversation where our CW7 and 10 says we're going to have to reduce the forecast because of the errors from 2013. That's causing us to have improperly recorded, expected 20 million in 2014, but it really came in in 2013. Let me make sure I understand what you're saying. That sounds like the error has already happened and we need to do something about it, as opposed to? Yes. What we're saying is that by July of 2014, the CEO and CFO know that there's $20 million that was recognized that the ES segment was expecting in 2014, but was recorded in 2013. And they said we obviously can't record it twice, so we're going to have to back it out in 2014 because it went into 2013. And why that is significant and material is because, remember, this is a company that's on the completion of the contract accounting,  and you would see the expenses associated with the contract. And that's what was not happening here. That was the problem. Counsel, let me ask you, putting aside the issue of materiality and assuming that there is a material misrepresentation or discrepancy, to what extent can the court consider or should it consider any type of remedial effort or reaction, corrective action, or any other type of activity in this case where there is an after-the-fact realization or reporting of some impropriety? And I'm speaking specifically with regard to the pleading of Sienter. I understood, Your Honor. I think that to the extent there is remedial action that is being undertaken by the time, yes, that is a fact that a court should consider as part of the overall Sienter analysis. So we think that, in essence, all goes into the mix. Our argument here is that we don't think that remedial actions were taken, but we also think that a competing inference from those facts that could be drawn in favor of the plaintiff and should have been is that there were no remedial actions taken. The actions taken were, let's see if we can get more revenue here to mask the problem, which we think the inference is, let's just cover it up, brush it under the rug, and move on. And I think what supports our inference even more is that the company did restate its financial results and did restate for the very reasons why we plead. So I think a very fair and strong inference is there were no remedial actions taken, because if there were, you would not expect them to have restated for that reason. So in this context, we do think that when you look at what was told to these defendants in July of 2014, it's $20 million, really, that was involved, that they're actually told the accounting errors are greater, the revenue recognition issues are greater than what was actually restated. Because as we said, in 2013 in the ES segment, $11.5 million worth of revenue was taken out because it was improperly recorded. And when you run through the— But that was never conveyed. That was never conveyed to the chief executive or the top management. No, that was not, Your Honor. But during our time period, they are told about the $20 million being a problem. So they're told it's actually worse than it turned out to be. And then they're also told in September of 2014, we're continuing to work through these problems from 2013. If you're even having an impact in the third quarter, we expect a problem in the fourth quarter. We're going to have to report a loss. I mean, back to what Judge Ho was talking about is the problem of looking back. I mean, where is the material false statement made with Scienta that is prosecutable under 10b-5? What false statement are we talking about? What specifically? What is that? Well, the full statements certainly are the 2014 financial results. Okay, 2014 financial results. And 2013. And 2013. And when did these, what you're claiming are, I guess, reckless accounting, when did that occur? Well, the reckless accounting was occurring throughout 2013 and 2014. When did anybody know that? Well, our two defendants who we're charging certainly by April of 2014 start to learn of the problems. They are told by July of 2014 that the problems are even greater than what they were told in April. Okay. And they are continuing to be told about it. Once they were told that, was any false statement, any statement, did the false statement continue to be made after they had been told of the discrepancies? Yes, Your Honor. What happens is each time. And when was that? They will continue to republish the 2013 results as a comparison to 2014. So in the first quarter of 2014 forward, they continue to republish the 2013 results that, as we say, they know were recklessly disregarded, contained false numbers. It also implicates their Sarbanes-Oxley certifications. Of course, part of that is this Court, as many courts have found, are there red flags to an executive that would suggest you have a problem with your accounting? Your point is not that they lied at the time the inaccuracy was made, but that once they were told this is inaccurate, they repeated the lie. Yes, Your Honor. Exactly. Exactly. There are no facts that are pled to say that they actually knew about it in 2013, but beginning April of 2014, they knew. And going forward, they know about it, and they don't take any steps to correct it, and they keep republishing those numbers. That, in essence, is our argument. Republishing it. Where do they republish it? Republishing those numbers. Yes, Your Honor. In their reports to the SEC? Yes, Your Honor. Yes. Those get republished in their SEC filings. We also— But you're contending they should have corrected the 2013 and 2014 numbers? What are you— Well, what we're saying, Your Honor, is, first, they should have corrected the 2013 numbers when they learned about it in 2014, but they also now know that the errors from 2013 are flowing into and impacting the 2014 numbers. So both sets of numbers are going out with these two defendants, as we claim, with knowledge that there were errors in these financials. And so with that, obviously, one that we think is sufficient evidence to show that they know or disregard the numbers are false, it also implicates their Sarbanes-Oxley certifications because now they have red flags. They know that we have a problem with our internal controls. We have a problem knowing that we may be putting out false or bad numbers, and we should be correcting that and alerting the market to that. Unless Your Honors have any further questions, I'll set my time for rebuttal. Thank you. Thank you. Mr. Bondi. May it please the Court, Your Honors, my name is Brad Bondi and I represent Global Power Equipment Group. I'm joined at the table with counsels for Defendants Ramirez and Guba, who also will be addressing the Court. Your Honors, this is the third and final attempt of the plaintiffs to state a cause of action for securities fraud. At the hearing below on the motion to dismiss, the plaintiffs conceded they don't know any more facts than they've already alleged. The first attempt occurred four years ago in the wake of the restatement. In that intervening time period, there's been a special committee investigation of the Board of Directors that concluded that there was no intentional misconduct associated with any of the errors leading to the restatement. There's been an SEC investigation, which the plaintiffs make much ado about in their initial complaints, which was closed without taking any action against the defendants. These are in the records, and this Court can take judicial notice as it did in Shaw. Judge Lynn at the district court below gave plaintiffs plenty of attempt to state a cause of action. She held a hearing. She heard evidence. She conducted a holistic review of the complaint. Keeping with Tellab, she balanced the competing inferences of Scienter, and she held that the plaintiffs had failed to state a claim for cause of action in their third amended complaint for Scienter and dismissed with prejudice. This Court, in doing its own de novo review, should reach the same decision. The Private Securities Litigation Reform Act requires that plaintiffs show a strong inference of Scienter and plead facts with particularity. What do you make of their point that they have pled facts, that once defendants were told of the inaccuracies, they nevertheless repeated them? Your Honor, let's talk about that. What they're talking about is 2014 oral reports of errors that occurred in 2013 involving a mere 10 to 12 contracts, according to their other complaint, that involved a couple of million in total revenue. A couple of million in total revenue. By the way, they haven't ever even alleged what these 10 to 12 contracts were involved. They haven't explained. Your point is they were repeated, but they were too small to be material? Well, Your Honor, two points on that. First of all, with respect to materiality. Your Honors are correct in that the district court can dismiss on behalf — on the basis of materiality. This Court said in ABC Arbitrage v. The Rook that a court can determine statements to be immaterial as a matter of law at the motion-to-dismiss stage. And that would make sense here, because at best, the plaintiffs at best have alleged knowledge of immaterial errors in a non-reporting unit of a non-reporting segment of the company. What they've alleged at best is a couple of million dollars in total revenue. Now, whether that's the face value of the contract or the amount of the error, let's give them the benefit of the doubt and say it's the amount of the error. A couple of million, let's say 2 million, and a balance sheet of $464 million, close to half a billion dollars. Now, a good example of a district court dismissing on the basis of immateriality on a similar allegation was Judge Godbee in the Northern District of Texas in the Tabinfields v. Hotels.com case, where Judge Gabbany pointed out that the errors in that case amounted to less than 1.5 percent of revenue for the quarter of the call. Here, at best, they've alleged errors that are less than 1 percent of the total revenue of the company. Moreover, though, Your Honor, we think that the case, this Court's decision in ABC arbitrage v. DeRook is instructive here, because we submit, Your Honors, that the plaintiffs have only alleged errors with respect to the non-reporting unit of a non-reporting segment of the company, and they haven't connected those errors to the reported financials. Okay. In ABC v. ABC arbitrage case, that case involved allegations of a $125 million error in a non-reporting German subsidiary of Alcatel. And the Court said that any allegations that somehow this error in the non-reporting segment affected the reported financials was conclusory. Similarly here, Your Honor, the plaintiffs' allegations with respect to the errors in the non-reporting unit involving, again, just a mere 10 to 12 contracts involving a couple million dollars amounts to conclusory. I mean, their argument is not necessarily frivolous that these huge number of errors that were subsequently made and subsequently revealed indicate carelessness and that $125 million could be evidence of science, that the company was on a path to try to minimize as much as it possibly could its losses, which as I understand was like, what, 545 percent adjustment in your reporting to the SEC, was it not? Your Honor, I think the case in — we would disagree with that assessment of the plaintiffs' allegations. And here's why. In the case of Abrams v. Baker Hughes, the Court — I mean, if you make the amount of errors that amount to 545 percent, and I'm not quite sure about my math on that, but anyway, that's what was represented to us, it seems to me that the errors there would have been apparent to a blind man. I mean, those kind of errors are not just ordinary run-of-the-mill errors, are they? Well, Your Honor, the fact is the errors that led to the restatement, there were five categories of errors that led to the restatement. Only one of which had to do with the ES segment of the company. And the errors with respect to the ES segment of the company dealt not just with timing issues that plaintiffs try to say was at issue here, but they dealt with other errors such as failing to recognize revenue related to contractual liquidated damages. Point being here, the restatement had to do with a lot that has nothing to do with the plaintiffs' allegations in the complaint. And as this Court said in Abrams v. Baker Hughes, that the mere publication of inaccurate accounting figures or failure to follow GAAP without more does not establish scienter. But what about the republication? I think Judge Jolly asked your opponent earlier about republication. I believe that's part of their position, is that the defendants are aware of inaccuracies, and again, let's assume for the purposes of this question that they're material. I understand that's a separate issue, but what about republication of the types of things Judge Jolly just asked about? Well, first of all, Your Honor, we would agree that the errors that are alleged about these 10 to 12 contracts are immaterial. They're immaterial as a matter of law. But in addition, Your Honor, they haven't connected those errors to the published financials, nor can they. And here's why. Why do you keep dancing around this 545 percent adjustment that were made in your revenues? I mean, address that. I mean, how do you explain that kind of errors, and in the light of those errors, you republish? Well, Your Honor, let me be very clear. If I'm wrong, tell me I'm wrong. But try to address what I'm asking about. Sure. Respectfully, Your Honor, I believe you're incorrect. And here's why, Your Honor, is the percentage errors that they've described were driven by issues that had nothing to do with the allegations in this complaint. For instance, the big driver of the restatement dealt with a different division which changed their accounting methodology from completed contract to percentage of completion, and that created a reallocation of revenue and expenses. That's not the republishing they're talking about here. What the republishing they're talking about here is republishing, they allege, errors associated with 10 to 12 contracts involving a couple of millions of dollars. I understand that specifically, what they're talking about. But would the republication, I mean, the 2013 publication was republished in 2014. Is that correct? Correct, Your Honor. And this reduction by 545% in terms of the revenues of the company occurred when? Occurred as part of the restatement in 2015. In 2015? Yes, sir. And did they republish the 2013 in 2015 as well? No, Your Honor. They restated 2015. And I think this is the point here. What they've alleged is there was a restatement in 2015 caused by five different categories of errors, four of which have nothing to do with the plaintiff's complaint, nothing. Okay. There was a restatement in 2015 relating to the 2013 and 2014 financials. The allegation they're making — In 2015 there was a restatement. Yes, sir, relating to the earlier financials of 13 and 14. And what this Court has said — In the meantime, when they published it in 2015, they were well aware of the 545% reduction in income or revenue that I'm referring to. But there's no allegations in the complaint that there was any fraud or recklessness with respect to — When did this — when did it occur? When did these mistakes that ultimately rendered a $545 million mistake occur? And when was that known to the company? It was discovered during the restatement process. When? In 2015. Okay. And, Your Honor, what — And still, in 2015, they republished 2013. No, Your Honor. They corrected 2013. So 2013 was a corrected — a republication of own correction. And Your Honor is not alleging any issues with respect to the — Is that right? Your Honor, the plaintiffs are not alleging any issues with respect to the restatement. What they're saying is that in 2014, that somehow the financials had repeated the errors involving the 10 to 12 contracts involving the couple of million dollars, which itself is not material. But, Your Honor, I want to add one point here, which I think is important, is the plaintiffs, similar to ABC arbitrage, they haven't connected the errors in the nonreporting segment to the reported financials, nor can they. And the reason why is they rely on two confidential witnesses, which themselves must be discounted under this Court's decision in Shaw. But the two confidential witnesses, as they concede in their opposition to the motion to dismiss, can only provide information on what they have knowledge of, and not whether Global Power's financial results were properly presented to investors. That was described in Confidential Witness 7. Same is true from Confidential Witness 10. And Judge Lynn appropriately found that nothing in the Third Amendment complaint, however, would support the conclusion that CF-7 or CF-10 possesses any information on the accuracies of Global Power's financial results outside of the ES segment. They haven't connected the alleged errors in the nonreporting unit to the reported  Thank you. Thank you, Your Honor. Mr. Offsys? Did I pronounce that correctly? Excuse me? Offsys? Offsys. Offsys? Yes. May it please the Court, my name is Arthur Offsys. I'm appearing today for Luis Manuel Ramirez, who was Chief Executive Officer of Global Power from 2012 to March 20 of 2015. He left before the restatement process got underway and was completed. This Court knows even better than I do how exacting the pleading standard that the plaintiffs face here. They have to plead facts, not conclusions. Those facts have to be particularized. Those particularized facts have to support a strong, powerful inference of scienter. Scienter means either an intent to manipulate or deceive or severe recklessness in making the omission or the misstatement. And severe recklessness means an extreme departure from standards of ordinary care. We submit, Your Honors, that there are at least four sets of evidence in this complaint that completely defeat any such strong inference of scienter on the part of Mr. Ramirez. Two of these points Mr. Bondi has already made. I don't understand the case nearly as well as the lawyers do here. I've read just the briefs and I'm getting two sides and they're somewhat contradictory. But are you telling me from your point of view that the matter that I keep harping on, and that's the discrepancy in the $545 million, has no relevance whatsoever in the plaintiff's case and cannot be considered, and why? It has some relevance, but it's very limited, Your Honor. And the District Court recognized that it had some relevance, but here's why it's limited. One, we don't know from the allegations in this complaint that there was any republication of the problems that were discovered in this one segment, the ES segment. The witnesses. The $545 million is not confined to ES segment, is it? Understood. But that's not the case that's been brought here. There are no allegations. I fully understand that the $2 million or the immaterial aspect of the case would establish science or perhaps if it were more, if it were not immaterial. And I understand that they are not relying solely on that or they can't rely solely on that. But if you take that along with the matters that I've been raising, it seems to me that you are getting to the point where the recklessness is the kind of conduct that you can draw inferences from of science. There is no allegation in the complaint, however, that Mr. Ramirez was told anything at all about problems in these other segments. Well, for your client, that's good. The only allegations concern the 10 or 12 contracts and the couple million dollars of revenue in 2013 in this one segment. And that's what has to be focused on to see whether it supports the inference of severe recklessness. Before we can determine that they have a case, we've got to show science on the part of your client and Mr. Gubel. Is that correct? That's correct. And if we can't do it on those two, I mean, just the corporation standing out there as an entity of some sort makes no difference. We've got to establish science on those two individuals. That's exactly right. That's exactly right. And that's what they haven't done. Four reasons for that. One, the immateriality of the error in the ES segment. Two, the lack of a connection between the allegations against Mr. Ramirez and the events in the other segment that led, as Mr. Bondi said, to the bulk of the restatement. And the third is, and the fourth, pick up on the question that Judge Englehart asked about remedial actions. What's very relevant to this determination is what was Mr. Ramirez told and what did he do? And the allegations of the complaint are very telling on that, and we say they defeat the inference of Sienter. First, what was he... Thank you. Your time is up. Thank you. Thank you. Let's give appellant's counsel one more minute. Mr. Coggins. Thank you, Your Honors. Paul Coggins on behalf of Mr. Guba. And I'd like to pick up where my counsel, I think, was about to leave off, and that is with the issue of remedies. Because I think what Judge Lynn did here is, and I think what appellants are aware of, is that she failed to draw inferences for them, which she did. But she did a comparative evaluation of the inferences. And after she did that comparative evaluation of the inferences, what she found was the inferences didn't lean toward fraud. They leaned in the opposite way of fraud. And she pointed to a number of things in doing that. First, I'd like to point out that Mr. Guba joined the company in November of 2013. So he'd been CFO for approximately five months in April of 2014 when the disclosure, the small disclosure of the $1 or $2 million issue arose. And what did defendants Guba and Ramirez do? They set up a scorecard to manually track when these things should be accounted for. They, in addition to that scorecard, conducted weekly calls with the electrical solutions division to basically fix the problem. And one of the things Judge Lynn pointed out in her opinion, and I think it's hugely important to Your Honors, is this. She pointed out that for all apparent purposes, it had been fixed. There was no evidence, for example, no allegation, that Mr. Guba thought that the That's a strong inference that points away from fraud, as does the hiring of outside consultants, as does the certifications of the internal controls by BDO. Both years, 2013 and 2014, BDO certified that the internal controls of the company were effective and adequate. Now, they might have withdrawn those later, but we're dealing with what these defendants knew in 2014. And by the way, that site I talked about is Judge Lynn on page 12, footnote 13, said there is no allegation that Mr. Guba knew that the 2013 issue recurred in 2014. And no reason to believe it had because of the remedial actions taken by the defendants in this case. And it is also important, I think this was pointed out, that the confidential witnesses in this case, and there are two of them that are relevant here, are solely confined to the electrical solutions division, the non-reporting division, which is far and away the smaller division here. So I think, Your Honors, if you look at it, there are sort of three issues here. There's the small $1 million to $2 million issue, discrepancy, and there's little to no linkage between that and the $20 million which the appellate raised. In fact, the judge's opinion actually dealt with that $20 million as well. And if you look at the record on appeal, what the record on appeal says about the $20 million is, quote, as the ES segment, the electrical solutions segment, would not close and complete as many projects as they initially forecast, and expenses would be higher. So bottom line, business was not as good as it was expected to be, and expenses are going to be higher. That's not just a revenue recognition problem. And what these people talked about in 2014 April was a revenue recognition problem. So the $1 million to $2 million is what has been brought to these defendants' attention. They attempted to fix it. For all apparent purposes, they did fix it, and it's not connected to the $20 million and far, certainly not connected to the larger restatement. And thank you, Your Honors. Thank you. Mr. Block. Let's go ahead and give them seven minutes total. Seven minutes total. Thank you. Thank you, Your Honors. Let me first start off with the concept that we talked about, we heard about, which was this all occurred at a non-reporting unit, some small subsidiary. What we know is that the company said there were actually four reasons why they restated their financials, one of which were the exact problems at this supposed small non-reporting subsidiary. So we know that what happened at the ES segment had an impact on the financial statements because the company went out and described it as one of the four reasons why. What we know from the restatement is that the company found in the restatement $11.5 million worth of revenue in the ES division was prematurely recorded. What we know from the restatement is that almost the entire restatement was driven by improper revenue recognition in 2013. Most of that, over 60% of it, came from the ES segment. So what we know is our confidential witnesses say that Ramirez and Gruber were told starting in April that we have a couple million in revenue that's a problem. On the July call, they're specifically told we now have a $20 million problem because when we have gone back and we're continuing to deal with these problems, it's now $20 million. So what Ramirez and Gruber both know in July 2014 is the ES segment has a $20 million problem. And that goes right to the bottom line. And I know we keep talking about revenues being overstated, but when you are recording revenue from these kinds of contracts and this kind of accounting, you're not matching the revenue and expenses. Let me ask you, if you're relying on the two confidential witnesses, the two CWs, was it seven and ten I think they're identified as, how do you respond to the argument that their knowledge is so limited that it could not possibly encompass large enough figures to be material? Is that what I understood, counsel, to just tell us if you would respond to that,  Certainly, Your Honor. I understand the argument, one, is that their knowledge is limited just to the ES segment. Right. But clearly that is one of the reasons why there's a restatement. And when you look at 2013, it's a big amount of 2013. So they certainly would be in a position to know what's going on in their segment. Number two, what we also hear is that this was a small reporting unit, and how do we know that these two executives didn't actually go out and take steps, the remedial action, to fix it? Well, what we know is they actually restated because of these reasons. And I certainly think a fair inference, certainly the stronger inference, is if you actually went out and restated for the very reasons why you were told your And I think what you have is in April of 2014, they're told it's a couple of million. By July of 2014, they're now told it's 20 million. Well, if the inference is that we acted to correct it, we would expect it would be corrected, or something would happen. But by July 2014, the two CWs are saying we're still having these problems. September of 2014, Ramirez gets an e-mail saying we're continuing to work through the 2013 problems, and it's having even a bigger impact on 2014. In December of 2014, Ramirez tells our CW7, I'm putting you on leave because there's a problem with your financials. She is fired in January. And remember the timeline here. In March, early March of 2015, Ramirez signs off on the financials. He resigns 11 days later on March 20th. Basically six weeks later, on March 5th, the company comes out and says, don't rely on our financial statements. We've got errors. So I think the fair inference, the stronger inference to be drawn is that these problems were not corrected. And I know, Your Honor, Judge Gelley, you keep asking about the 545 percent overstatement of net income. What we've alleged here is, and this Court has recognized, as most courts have a very large financial statement restatement. Certainly that in and of itself isn't enough. It doesn't get you over the hurdle. But you get something. Here the district court said, I'm not going to give you an inference from that financial statement restatement unless you first show to me they knew. So what it does is it really flips the concept of an inference on its head. So what the court is saying is, if you have facts and evidence showing me they knew or recklessly disregarded, I'll now give you an inference from something else. But if I have those facts, if I have the facts that they knew about everything, I don't need an inference. And that's where we think the court committed the error in the framework that the court approached this. We don't think that the court, what the court didn't do, as you can see from the actual restatement itself, didn't say, there was some inference that goes in favor of the plaintiff here. I'll see. I'll take that inference. I'll take the facts from what we know from the CW-7 and CW-10. I'll take the facts that they are aware that there are these internal control problems, that BDO is continuing to express these concerns, even after the outside consultants come in and said, if I take those facts and I draw an inference in favor of the plaintiff, is it just as strong that these defendants were reckless? Or is it that, no, it's just, it's stronger that they didn't know? Pardon my ignorance, but where do you get that a restatement of a large amount provides at least some inference of scienter? I think in the Court's recent decision, Your Honor, I think it's Alaska Electrical v. Essar. One of the points the Court said was that there is some inference that a plaintiff gets from a restatement. That in and of itself isn't enough, and we don't say it is. But it is a piece of the weight that we think would go on the scale. It's evidence that a mistake was made. Yes. It doesn't suggest that it was intentional as opposed to accidental or negligent. Right. And we're not suggesting by any stretch that that in and of itself gets us there. We're saying that is just one small piece of weight that would go to the plaintiff. And if all we had was a restatement and we didn't really have anything else, many of us wouldn't be here today, that that's not enough. That doesn't get you there. But what we think is it is something, and the Court should have at least said, well, I'm going to give a little weight to the plaintiffs on that. And we don't think that clearly the Court didn't do that, and we think that shows sort of the analytical, the framework the Court applied that we think was error. Now, what you also heard is that the big driver of the restatement were the other three categories and not our ES segment. What I think happened here was we have your argument. I'm sorry? We have your argument. Okay. Thank you, Your Honor.